Elizabeth MWANGI, Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, Whitman Associates, Inc., d/b/a A Plus Realty Georgia, and Asset Management Specialists, LLC, Defendants.

CIVIL ACTION FILE NO.:
4:14–CV–0079–HLM

United States District Court,
N.D. Georgia, Rome Division.

Signed February 16, 2016

---

Alyson A. Straight, Andrew C. Evans, Evans Law, LLC, Atlanta, GA, for Plaintiff.

Frank Reid Olson, John Dale Andrle, Cobb, Olson & Andrle, LLC, David S. Klein, Ned Blumenthal, Weissman Nowack Curry & Wilco, P.C., Atlanta, GA, Burke Blackwell Johnson, Morris Schneider Wittstadt, LLC, Loganville, GA, for Defendants.

*ORDER*

Harold L. Murphy, UNITED STATES DISTRICT JUDGE

This case is before the Court on the Motion for Summary Judgment filed by Defendant Federal National Mortgage Association ("Defendant Fannie Mae") [119].

## I. Background

### A. Factual Background

Keeping in mind that, when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir.2012). This statement does not represent actual findings of fact. *Rich v. Sec'y. Fla. Dep't of Corr*, 716 F.3d 525, 530 (11th Cir.2013). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

As required by the Local Rules, Defendant Fannie Mae filed a Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried ("DSMF"). (Docket Entry No. 119–3.) As also required by the Local Rules, Plaintiff filed a response to DSMF ("PRDSMF"). (Docket Entry No. 125.) As permitted by the Local Rules, Plaintiff filed her own Statement of Additional Material Facts ("PSMF") (Docket Entry No. 128), to which Defendant Fannie Mae responded ("DRPSMF") (Docket Entry No. 131). The Court evaluates DSMF, PRDSMF, PSMF, and DRPSMF below.[1]

### 1. The Property

In 2006, Plaintiff purchased property located at 101 Natalie Court, Dallas, Georgia 30157 (the "Property") with a loan (the "Loan"). (DSMF ¶ 1; PRDSMF ¶ 1; PSMF ¶ 1; DRPSMF ¶ 1.) The Loan was secured by a deed to secure debt (the "Security Deed") executed by Plaintiff, which named Mortgage Electronic Registration Systems ("MERS") as the nominee and AmTrust Mortgage Corporation, including its successors and assigns ("AmTrust"), as Lender. (DSMF ¶ 1; PRDSMF ¶ 1; Security Deed (Docket Entry No. 30–4).) The Loan and the Security Deed were later transferred to JPMorgan Chase Bank, National Association ("Chase"), which foreclosed in February 2013. (PSMF ¶ 2; DRPSMF ¶ 2.)

Plaintiff endured financial hardship and attempted to short-sell the Property as an alternative to foreclosure. (DSMF ¶ 2; PRDSMF ¶ 2.) Plaintiff last made a mortgage payment in spring 2012. (DSMF 3; PRDSMF 3.) By spring 2012, Plaintiff was in default under the terms of her loan. (Dep. of Pl. Vol. I (Docket Entry No. 57–1) at 26, 28–29.)

By at least October 2012 and prior to the foreclosure, Plaintiff listed the Property for sale through a Realtor, Kimani Karangu. (DSMF ¶ 17; PRDSMF ¶ 17; PSMF ¶ 3; DRPSMF ¶ 3.) In the listing for the Property, Mr. Karangu described the "Owner's Name" as "VACANT." (DSMF ¶ 18.) According to Mr. Karangu, this description only signaled that no one was living on the Property, and did not convey that the Property was empty or abandoned. (Dep. of Kimani Karangu (Docket Entry No. 58) at 27–28, 61–62, 64.) Mr. Karangu had access to the Property after Plaintiff moved out in 2012, and he came and went from the Property without

---

1. The Court observes that certain of Defendant Fannie Mae's responses to PSMF are improper lengthy narratives or argumentative. (DRPSMF ¶¶ 15, 20–21, 35.) The Court reminds counsel that lengthy responses to proposed statements of material facts are inappropriate and violate the Local Rules. *See Walker v. United States, IRS*, No. 4:07–CV–0102–HLM, 2009 WL 1241929, at *3–4 (N.D.Ga. Feb. 26, 2009) ("'[A party] must remember that a response to a statement of undisputed material facts is not an opportunity to write another brief. If the fact stated is true, admit it. If the fact is legitimately disputed, then say why, cite the evidence that supports the denial, and stop.'" (internal quotation marks and citation omitted)).

first notifying or consulting Plaintiff. (Pl. Dep. Vol. I at 71, 76, 88, 93, 95.) Mr. Karangu showed the Property to several individuals and real estate agents, and did not tell Plaintiff that agents and prospective buyers would enter the Property without providing prior notice to Plaintiff. (DSMF ¶ 21; PRDSMF ¶ 21.)

In or about April 2002, Plaintiff moved out of the Property and into an apartment with her sister after experiencing health complications with a pregnancy. (Pl. Dep. at 25.) Plaintiff brought with her only a bag of pregnancy clothes and some "female personal stuff." (*Id.* at 45.) Plaintiff forwarded her mail from the Property around the time that she moved in with her sister. (DSMF ¶ 10; PRDSMF ¶ 10.)

When Plaintiff moved in with her sister, she cut off virtually all of her utilities at the Property. (DSMF ¶ 11; PRDSMF ¶ 11.) For example, the water at the Property was turned off on November 8, 2012, and was not turned back on until after February 13, 2013. (DSMF ¶ 12; PRDSMF ¶ 12.) Plaintiff's SCANA Energy gas account was closed in May 2012. (DSMF ¶ 13; PRDSMF ¶ 13.)

After Plaintiff moved in with her sister, various individuals including Mary Theresa Mwangi, Sarah Wanjira, and Catherine Muriuki had access to the Property. (DSMF ¶ 22; PRDSMF ¶ 22.) Plaintiff points out that only Ms. Wanjira and Mary Theresa Mwangi had keys to the Property.

After Plaintiff went to stay with her sister, Ms. Wanjira visited the Property and packed Plaintiff's items into boxes. (Dep. of Sarah Wanjira (Docket Entry No. 117) at 14, 52.) Ms. Wanjira moved the boxes into the garage and downstairs hallway so that Plaintiff could hire movers and retrieve her possessions on short notice. (*Id.* at 52; Pl. Dep. Vol. I at 68.) Ms.

Wanjira testified that she last visited the Property in January 2013. (Wanjira Dep. at 14.)[2]

Plaintiff testified that she returned to the Property on one occasion after moving in with her sister, and that, during this visit, she did not open boxes and she stayed for less than an hour. (DSMF 23; PRDSMF 23.) According to Plaintiff, this visit occurred in November or December 2012. (DSMF ¶ 24; PRDSMF ¶ 24.)

In December 2002, Jerry Juhl, a licensed real estate agent and property inspector, visited the Property on behalf of one of his clients interested in the listing. (DSMF ¶ 30; PRDSMF ¶ 30.) According to Mr. Juhl, he observed that: (1) the family room had no furniture and, except for a few papers lying on the floor, was empty; (2) the breakfast area had a small table and chairs; (3) the kitchen had some silverware in the drawers, and all of the cabinets had been partially emptied; (4) the garage contained many items that looked as if they had been simply tossed in or rummaged through; (5) the master bedroom had only a bed frame, and the closets contained no clothes; and (6) none of the other bedrooms had furniture. (Decl. of Jerry Juhl (Docket Entry No. 113–3) ¶¶ 5–6.) According to Mr. Juhl, the utilities were not on, and a hot water tank was leaking into the laundry room. (*Id.* ¶ 5.) In Mr. Juhl's opinion, the Property appeared to be uninhabited, and, because it had no utilities, was uninhabitable. (*Id.* ¶ 5.) Mr. Juhl averred that he visited the Property on two more occasions, and that, on each occasion, "the conditions remained the same as [he] observed during [his] initial visit on or around December 12, 2012." (*Id.* ¶ 6.)

---

2. Defendant Fannie Mae contends that Ms. Wanjira last visited the Property by November 18, 2012, at the latest. (DSMF ¶ 29; PRDSMF ¶ 29.)

### 2. The Foreclosure

Plaintiff's efforts to short-sell the Property failed, and on February 5, 2013, Chase foreclosed on the Property. (DSMF ¶ 25; PRDSMF ¶ 25; PSMF ¶ 2; DRPSMF ¶ 2.) On that same day, the Property was conveyed to Defendant Fannie Mae. (DSMF ¶ 25; PRDSMF ¶ 25; PSMF ¶ 5; DRPSMF ¶ 5.)

### 3. Assignment to a Realtor

On or about February 8, 2013, three days following the foreclosure of the Property, Defendant Fannie Mae assigned Defendant Whitman Associates, Inc., d/b/a A Plus Realty Georgia, LLC ("Defendant Whitman") to facilitate the listing of the Property for a real estate owned ("REO") sale. (DSMF ¶ 26; PRDSMF ¶ 26.) Defendant Whitman, in turn, assigned Chris Singleton, a Realtor affiliated with Defendant Whitman, to list the Property. (DSMF ¶ 26; PRDSMF ¶ 26.)

Defendant Whitman and Defendant Fannie Mae have a Master Listing Agreement under which Defendant Whitman, as broker, agrees to manage and sell Defendant Fannie Mae's properties under Defendant Fannie Mae's sales guide. (Master Listing Agreement (Docket Entry No. 126-1) at 5-6.) Under that Master Listing Agreement, Defendant Whitman, as broker, warrants that all subcontractors will follow the policies and procedures contained in the sales guide. (Id. at 18-19.) The Master Listing Agreement states that brokers shall be responsible for the conduct of their subcontractors, and requires brokers to manage their personnel and subcontractors. (Id.) If a broker's personnel do not observe best industry practices, the broker will be subject to termination. (Id.)

Defendant Fannie Mae's Sales Guide also requires brokers and their personnel to learn and follow all applicable laws. (Sales Guide (Docket Entry No. 126-2) at 10-11.) The Sales Guide provides that, if a broker is uncertain about the value of personal property or suspects that the property may be sentimental, the broker must photograph and inventory the personal property, and must confer with Defendant Fannie Mae. (Id. at 36, 41-42.) The Sales Guide requires brokers to update all occupancy changes. (Id. at 41, 43, 46.) According to the Sales Guide, "misrepresenting available options for tenants" in a Knowing Your Options notice ("KYO flyer") is a potential example of fraud. (Id. at 11.)

Defendant Whitman only gets paid by Defendant Fannie Mae if and when a Defendant Fannie Mae property sells, and Defendant Singleton only gets paid for sales of Defendant Fannie Mae properties once the properties sell and after Defendant Whitman receives a commission. (Dep. of Chris Singleton (Docket Entry No. 43) at 67, 71.) During the time period relevant to this action, Mr. Singleton was managing between fifteen and twenty Defendant Fannie Mae properties each month. (Id. at 20.)

Defendant Fannie Mae provided Mr. Singleton with its REO Sales Guide. (Decl. of Chris Singleton (Docket Entry No. 113-1) ¶ 5; Singleton Dep. at 24-25, 61.) The REO Sales Guide includes, among other things, instructions to determine whether a property is vacant and Defendant Fannie Mae's procedures for re-keying properties. (Singleton Decl. ¶ 5.) Mr. Singleton testified that he works within the scope of Defendant Fannie Mae's guidelines and that he upholds Defendant Fannie Mae's rules and directives. (Singleton Dep. at 62-63.)

Generally, after receiving a property assignment from Defendant Fannie Mae, Mr. Singleton researches the assigned property, including searching for the property in the listing service databases, pulling the tax record for the property, and

confirming the property's address. (Singleton Decl. ¶ 6.) Mr. Singleton then generally visits the assigned property to determine whether the property is vacant. (*Id.*) If Mr. Singleton determines that the property is not vacant, he informs Defendant Fannie Mae of this assessment through its automated online system, AMN, which will refer the property to an attorney to file a dispossessory action. (*Id.* ¶ 6; Singleton Dep. at 27.) If Mr. Singleton determines that the property is vacant, he informs Defendant Fannie Mae of that assessment through AMN and notifies a contractor with Defendant Asset Management Services, LLC ("Defendant AMS") to re-key the property. (Singleton Decl. ¶ 6.) In either situation, Mr. Singleton posts a KYO flyer on the door. (*Id.*) Once the re-keying process is completed for a vacant property, Mr. Singleton informs Defendant Fannie Mae of that fact through AMN, which, in turn, automatically contacts Defendant AMS to assign a local crew to perform a trash-out and clean up of the assigned property. (Singleton Decl. ¶ 7; Singleton Dep. at 29.) Mr. Singleton does not attend a trash-out and clean up performed by AMS. (*Id.*)

After a trash-out, Mr. Singleton inspects the property to ensure that it is clean to Defendant Fannie Mae's standards. (Singleton Dep. at 31.) Following a trash-out of a Defendant Fannie Mae property, Defendant Whitman lists the Property for sale. (*Id.* at 68.)

#### 4. The Trash–Out

On approximately February 8, 2013, Mr. Singleton visited the Property and noticed that the gas meter was locked, suggesting that it had been turned off. (DSMF 27; PRDSMF ¶ 27.) On that same date, Mr. Singleton posted a KYO flyer on the Property's front door. (Singleton Decl. ¶ 10; PSMF ¶ 7; DRPSMF 7.) Angela Ervin, another licensed Realtor affiliated with Defendant Whitman, accompanied Mr. Singleton to the Property for safety and to act as a witness. (Singleton Decl. ¶ 10.)

According to Mr. Singleton, when he visited the Property on February 8, 2013, he observed: (1) the gas meter was locked; (2) there were no lights on, including the light on the doorbell; (3) the grass was tall and unkempt; and (4) no one answered the door. (Singleton Decl. ¶ 10.) Plaintiff contends that the grass was due to be mowed on the day after the trash-out. (PRDSMF ¶ 30.) Mr. Singleton advised Defendant Fannie Mae through the AMN system that the Property was vacant, and arranged to meet with Clint Aiola, who worked with Defendant AMS. (Singleton Decl. ¶ 11.) Mr. Singleton made the determination that the Property was vacant. (Singleton Dep. at 18; PSMF ¶ 7; DRPSMF ¶ 7.) Defendant Fannie Mae did not directly review that determination. (PSMF ¶ 11, as modified per DRPSMF ¶ 11.)

Mr. Singleton returned to the Property with Mr. Aiola a few days later, on approximately February 11, 2013. (Singleton Decl. ¶ 12; PSMF 12, as modified per DRPSMF ¶ 12.) According to Mr. Singleton, he and Mr. Aiola walked through the Property and observed that the garage had open boxes and that clothes and other debris were on the garage floor. (Singleton Decl. ¶ 12.) Mr. Singleton recalled that the garage looked as though it had been ransacked, that there was no furniture inside the Property, and that neither he nor Mr. Aiola believed that the personal property present at the Property exceeded a value even remotely approaching $500 in garage sale value. (Singleton Decl. ¶ 12; Singleton Dep. at 64–66.) Mr. Singleton did not open all of the boxes in the Property's garage. (Singleton Dep. at 45.) Mr. Singleton acknowledged that he could call Defendant Fannie Mae's representatives if he has questions or concerns over Defen-

dant Fannie Mae's guidelines. (*Id.* at 61–62.) Under Defendant Fannie Mae's guidelines, Defendant Singleton determines that legal process is not required if a Property contains items worth less than $500. (*Id.* at 25, 63–64, 66.)

On February 11, 2013, Mr. Singleton gave Mr. Aiola the go-ahead to re-key the Property. (Singleton Decl. ¶ 12; Singleton Dep. at 37.) Mr. Singleton then notified Defendant Fannie Mae of the re-keying through the AMN system. (Singleton Decl. ¶ 12; Singleton Dep. at 37.) The AMN system notified Defendant AMS to conduct a trash-out and clean up. (Singleton Dep. at 37.)

On February 13, 2013, Defendant AMS retained a local crew, supervised by Mr. Aiola, to remove the trash and debris present at the Property. (DSMF ¶ 50; PRDSMF 50.) Mr. Singleton did not contact Plaintiff's listing agent. (Singleton Dep. at 53.) Defendant AMS, not Defendant Fannie Mae, directly retained Mr. Aiola. (Aff. of Clint Aiola (Docket Entry No. 59–5) ¶ 63; DSMF ¶ 63; PRDSMF ¶ 63.) According to Mr. Aiola, the dumpster used at the Property had been used in several trash-outs earlier that day. (Aiola Aff. ¶ 18.)

During the week after the foreclosure, Mr. Karangu called Mr. Singleton, asking where his lockbox was. (Singleton Dep. at 55.) Mr. Karangu appeared at the Property to get his lockbox while the crew was conducting the trash-out. (*Id.* at 56.) According to Mr. Karangu, he told the crew that it was not supposed to be removing items from the Property because the Property had just been foreclosed. (Karangu Dep. at 92–93; PSMF ¶ 28; DRPSMF ¶ 28.) Mr. Karangu testified that, on that date, he saw Plaintiff's jewelry in an open box, lawnmowers, a paper shredder, a vacuum, lawn mowers, a couch, a dining room set, a china cabinet, and a stereo set at the Property. (Karangu Dep. at 48–51, 70,

102–03; PSMF ¶ 33; DRPSMF ¶ 33 (admitting Mr. Karangu gave this testimony).) Mr. Karangu further recalls seeing most of Plaintiff's couch, her clothes, and boxes and boxes of Plaintiff's other things in a dumpster. (Karangu Dep. at 102; PSMF ¶ 34; DRPSMF ¶ 34 (admitting Mr. Karangu gave this testimony).) According to Mr. Karangu, he spoke to the manager of the crew and told him not to remove the items, but the manager stated that Mr. Singleton had instructed the crew to discard everything. (Karangu Dep. at 92–93.)

According to Mr. Karangu, he asked Mr. Singleton to stop the trash-out and informed him that the house was not vacant. (Karangu Dep. at 93.) Mr. Singleton acknowledges that Mr. Karangu contacted him on February 13, 2013. (Singleton Dep. at 56–57.) Mr. Singleton did not inform Defendant Fannie Mae of this conversation or upload notes of this conversation to Defendant Fannie Mae's AMN system, although he reported that Plaintiff called him on February 19, 2013, demanding the return of her personal belongings. (AMN Notes (Docket Entry No. 126–4).)

Defendant Fannie Mae's representative testified that Mr. Aiola and his crew should have stopped the trash-out if they were approached and notified that the items at the Property were not abandoned. (Dep. of Paul Hayes (Docket Entry No. 33–1) at 89.) According to Defendant Fannie Mae's representative, Mr. Aiola and his crew could have contacted Mr. Singleton if someone alerted them to leave the items at the Property during the trash-out. (*Id.* at 89–90.)

The local crew removed all items inside the Property on February 13, 2013. (Def. Fannie Mae Resp. Requests Admission No. 12 (Docket Entry No. 33–2).) The crew deposited the personal items on the

Property in a dumpster, and then removed that dumpster from the Property. (*Id.*)

After the trash-out, and during attempts to market the Property for sale on behalf of Defendant Fannie Mae, Mr. Singleton observed that the water heater leaked, that a portion of water pipe underneath the sink had been removed, that the water line at the water meter leaked, and that the main floor furnace had a gas leak. (Singleton Decl. ¶ 14.) According to Mr. Singleton, at the time of the trash-out, he "believed in good faith that the previous owner moved and took all of their possessions with them except for a few items of no value in the house including an old tube-type TV, damaged dresser, damaged chair, and debris on the garage floor including clothing and open empty boxes." (*Id.* ¶ 15.) Mr. Singleton contends that "[i]f there had been any items of value left in the Property or if [he] in good faith believed that the Property was occupied, [he] would not have reported the Property as vacant to [Defendant] Fannie Mae through the AMN system." (*Id.* ¶ 16.)

Likewise, Mr. Aiola contends that Defendant AMS's local crew did not remove any of the personal property that Plaintiff claims to have left at the Property. (Aff. of Clint Aiola (Docket Entry No. 59–5) ¶¶ 19–22.) According to Mr. Aiola, the local crew removed less than five cubic yards of trash and debris from the Property, and everything it removed was so materially damaged as to be clearly understood to be discarded debris or trash. (*Id.* ¶¶ 19–35; PSMF ¶ 25; DRPSMF ¶ 25.) According to Mr. Singleton and Mr. Aiola, they saw only ripped boxes and the crew discarded only hotel towels and clothes. (PSMF ¶ 26; DRPSMF ¶ 26.)

#### 4. Plaintiff's Property

According to Plaintiff, she left a number of items at the Property, including: (1) a bedroom set; (2) boxes with clothes; (3) a king-sized bed; (4) couches; (5) four tele-visions; (6) framed big pictures; (7) tools; (8) jewelry, including a five-carat engagement ring and two pairs of diamond earrings; (9) a lawnmower; (10) an edger; (11) a packed suitcase; (12) a thermos flask; (13) china; (14) a dining room set; (15) family pictures and photographs; (16) fitness equipment; (17) lamps; (18) a microwave; (19) a refrigerator; (20) a vacuum cleaner; (21) a desktop computer; (22) a printer; (23) a fax machine; (24) a video camera; (25) bed linens; (26) a chandelier; (27) an expensive clock; (28) Kenyan art; (29) Christmas tree decorations; (30) Kenyan attire; and (31) curtains or window treatments. (Pl. Dep. Vol. I at 135–224.) According to Plaintiff, the last time she visited the Property, she saw boxes, a couch, a bedroom set, and most of her other possessions in the garage, as well as a couch and television in the living room and beds in the guest bedroom. (*Id.* at 69; PSMF ¶ 22; DRPSMF ¶ 22 (admitting Plaintiff claimed to have seen this property).) Plaintiff also kept nonperishable food at the Property, and Mr. Karangu testified that he observed food in the cabinets and pots, pans, and a microwave at the Property. (Pl. Dep. at 119–20; Karangu Dep. at 43; PSMF ¶ 31; DRPSMF ¶ 31 (admitting PSMF ¶ 31 for the period prior to the trash-out).)

Plaintiff testified that she never saw the KYO flyer, but that, if she had seen it, she would have contacted Defendant within the ten-day period and would have removed her possessions from the Property. (Pl. Dep. Vol. I at 111–12; PSMF ¶ 10; DRPSMF ¶ 10 (admitting Plaintiff made this speculation).) Plaintiff contends that she intended to return to the Property and retrieve her personal items. (Pl. Dep. at 234–35.) Plaintiff testified that she never consented to Defendants changing her locks or removing her personal items. (*Id.*) Plaintiff presented evidence indicating that Mr. Singleton, or someone with

his access code, entered the Property on the night before the trash-out. (Karangu Dep. at 92.)

Plaintiff testified that she went to the Property, but that, when she arrived, the dumpster was gone, the locks were changed, and nothing was on her front lawn. (Pl. Dep. Vol. I at 123,127; PSMF ¶ 40; DRPSMF ¶ 40.) Plaintiff testified that she called Mr. Singleton to find out where her belongings were, but Mr. Singleton hung up on her. (Pl. Dep. Vol. I at 238; PSMF ¶ 41, as modified by DRPSMF 41, which admitted that Plaintiff gave this testimony.)

### 5. No Eviction Proceedings

Defendant Fannie Mae did not obtain a Writ of Possession before the trash-out or before Mr. Aiola changed the locks. (PSMF ¶¶ 13, 16; DRPSMF ¶¶ 13,16.) Defendant Fannie Mae never filed an eviction proceeding against Plaintiff in any Paulding County, Georgia, court with respect to the Property. (PSMF ¶ 17; DRPSMF ¶ 17) Additionally, Defendant Fannie Mae never filed a dispossessory action against Plaintiff in any Paulding County court with respect to the Property. (PSMF ¶ 18; DRPSMF ¶ 18.) Defendant Fannie Mae never obtained a Writ of Possession from any court in Paulding County with respect to the Property. (PSMF ¶ 19; DRPSMF ¶ 19.)

### 6. Relationships Among Defendants

According to Defendant Fannie Mae, Defendant AMS is not an employee of Defendant Fannie Mae. (Aff. of Salim Wilson (Docket Entry No. 59–6) ¶ 11.) Further, according to Mr. Aiola, he is not an employee of Defendant AMS. (Aiola Aff. ¶ 13.)

### B. Procedural Background

The Court incorporates the procedural background portions of its earlier Orders into this Order as if set forth fully herein, and adds only those procedural back-

ground facts that are relevant to the instant Order. (Orders of Mar. 9, 2015 (Docket Entry Nos. 68–69).) On December 17, 2015, Defendant Fannie Mae filed its Motion for Summary Judgment. (Docket Entry No. 119.) The briefing process for that Motion is complete, and the Court finds that the matter is ripe for resolution.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) allows a court to grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of showing the Court that summary judgment is appropriate and may satisfy this burden by pointing to materials in the record. *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1292 (11th Cir.2012). Once the moving party has supported its motion adequately, the burden shifts to the non-movant to rebut that showing by coming forward with specific evidence that demonstrates the existence of a genuine issue for trial. *id.*

When evaluating a motion for summary judgment, the Court must view the evidence and draw all reasonable factual inferences in the light most favorable to the party opposing the motion. *Morton v. Kirkwood,* 707 F.3d 1276, 1280 (11th Cir. 2013); *Strickland,* 692 F.3d at 1154. The Court also must " 'resolve all reasonable doubts about the facts in favor of the non-movant.' " *Morton,* 707 F.3d at 1280 (internal quotation marks and citations omitted). Further, the Court may not make credibility determinations, weigh conflicting evidence to resolve disputed factual issues, or assess the quality of the evidence presented. *Strickland,* 692 F.3d at 1154. Finally, the Court does not make

factual determinations. *Rich,* 716 F.3d at 530.

## III. Discussion

### A. Conversion Claim

Defendant Fannie Mae argues that it cannot be liable for conversion because Plaintiff abandoned any personal possessions left at the Property. (Def. Fannie Mae's Br. Supp. Mot. Summ. J. (Docket Entry No. 119–1) at 11–13.) As discussed *infra* Part III.B., a genuine dispute remains as to whether Plaintiff abandoned the Property or her personal possessions located there.

Alternatively, Defendant Fannie Mae argues that Plaintiff has no personal knowledge that any of her possessions remained at the Property at the time of the trashout, that other evidence indicates that nothing of value remained at the Property by the time of the trash-out, and that Plaintiff has no receipts or physical evidence to show that any of the claimed personal possessions existed. (Def. Fannie Mae's Br. Supp. Mot. Summ. J. at 12–14.) These arguments essentially ask the Court to weigh evidence and to judge the credibility of witnesses, which the Court simply cannot do at the summary judgment stage. The Court therefore cannot grant summary judgment to Defendant Fannie Mae based on these arguments.

▮ In any event, as Plaintiff points out, the evidence supports a finding that the local crew conducting the trashout removed and threw away at least some personal possessions at the Property. (Aiola Aff. ¶¶ 9, 35.) Under O.C.G.A. § 51–10–1, "[t]he owner of personalty is entitled to its possession," and "[a]ny deprivation of such possession is a tort for which an action lies." O.C.G.A. § 51–10–1. "In Georgia, [c]onversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights;

an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." *Vakili v. Wells Fargo Home Mortg., Inc.,* No. CV 212–104, 2013 WL 3868170, at *5 (S.D.Ga. July 24, 2013) (alteration in original) (internal quotation marks and citation omitted). "To establish a prima facie case for conversion, the plaintiff must show title to the property [or right to possess the property], possession by the defendant, demand for possession, and refusal to surrender the property." *Brooks v. Daimler-Chrysler Fin. Servs. Ams., LLC,* Civil Action No. 1:05–CV–1606–CC, 2006 WL 3327076, at *2 (N.D.Ga. Aug. 3, 2006) (alteration in original) (internal quotation marks and citation omitted); *see also Vakili,* 2013 WL 3868170, at *5 ("Where a person comes into possession of property unlawfully, he commits conversion if (1) another person had title to the property or the right of possession and (2) the alleged converter had actual possession of the property." (internal quotation marks and citation omitted)). Given the evidence indicating that the local crew disposed of at least some personal possessions at the Property, a genuine dispute remains as to Plaintiff's conversion claim. *See Washington v. Harrison,* 299 Ga.App. 335, 339, 682 S.E.2d 679, 683 (2009) ("Here, the [defendants] neither placed [the plaintiff's] personal property on a portion of the rear lot, to which they held the tax deed, nor on other property, which they designated and which the executing officer approved. Instead, they hired a salvage crew to simply remove [the plaintiff's] personal property from the rear lot with no consideration given as to its ultimate fate. Accordingly, the evidence supported the trial court's finding that the [defendants] were liable for conversion.").

### B. Abandonment

Next, Defendant Fannie Mae argues that Plaintiffs wrongful eviction and tres-

pass claims fail. According to Defendant Fannie Mae, it was not required to follow any statutory dispossessory procedures because Plaintiff abandoned the Property and was not living there. (Br. Supp. Def. Fannie Mae's Mot. Summ. J. at 14–20.)

 Under Georgia law, "[t]he exclusive method whereby a landlord may evict a tenant is through a properly instituted dispossessory action filed pursuant to O.C.G.A. § 44–7–50 et seq." *Ikomoni v. Executive Asset Management, LLC,* 309 Ga.App. 81, 84, 709 S.E.2d 282, 286 (2011) (internal quotation marks and citation omitted); *see also Roberts v. Roberts,* 205 Ga.App. 371, 372, 422 S.E.2d 253, 254 (1992) ("Unlike the situation that existed at common law, the exclusive method available today whereby a landlord may evict a tenant is the legal process set forth in O.C.G.A. § 44–7–50, and a landlord who seeks forcibly to evict a tenant by extralegal means may be liable to the tenant in damages, notwithstanding that the tenant is behind in rental payments.").[3] "After instituting a dispossessory action and obtaining a writ of possession, the landlord is authorized to evict the tenant, but the landlord must plac[e] the tenant's property on some portion of the landlord's property or on other specific property designated by the landlord and approved by the executing officer." *Ikomoni,* 309 Ga.App. at 84,

709 S.E.2d at 286 (alteration in original) (internal quotation marks and citation omitted). "If the landlord evicts a tenant without filing a dispossessory action and obtaining a writ of possession, or without following the dispossessory procedures for handling the tenant's personal property, the landlord can be held liable for wrongful eviction and trespass." *Id.; see also Owens v. BarclaysAmerican/Mortg. Corp.,* 218 Ga.App. 160, 162, 460 S.E.2d 835, 838 (1995) ("If the owner forcibly [dispossesses] a tenant without following [the procedures in O.C.G.A. § 44–7–50], the owner is subject to an action for trespass." (first alteration in original) (internal quotation marks and citation omitted)); *Swift Loan & Fin. Co., Inc. v. Duncan,* 195 Ga.App. 556, 557, 394 S.E.2d 356, 358 (1990) ("A landlord can be subject to an action for trespass because his remedy for taking repossession of the premises is codified at O.C.G.A. § 44–7–50.... A landlord may not forcibly dispossess a tenant without subjecting himself to an action for trespass even if the tenant is holding over beyond his term, is in arrears in his rent, and has received legal notice to vacate.").

 "Where former owners of real property remain in possession after a foreclosure sale, they become tenants at sufferance." *Bellamy v. F.D.I.C.,* 236 Ga. App. 747, 750, 512 S.E.2d 671, 675 (1999).

---

3. O.C.G.A. § 44–7–50(a) provides:

 In all cases where a tenant holds possession of lands or tenements over and beyond the term for which they were rented or leased to the tenant or fails to pay the rent when it becomes due and in all cases where lands or tenements are held and occupied by any tenant at will or sufferance, whether under contract of rent or not, when the owner of the lands or tenements desires possession of the lands or tenements, the owner may, individually or by an agent, attorney in fact, or attorney at law, demand the possession of the property so rented, leased, held, or occupied. If the tenant refuses or fails to deliver possession when so demanded, the owner or the agent, attorney at law, or attorney in fact of the owner may immediately go before the judge of the superior court, the judge of the state court, or the clerk or deputy clerk of either court, or the judge or the clerk or deputy clerk of any other court with jurisdiction over the subject matter, or a magistrate in the district where the land lies and make an affidavit under oath to the facts. The affidavit may likewise be made before a notary public, subject to the same requirements for judicial approval specified in Code Section 18–4–61, relating to garnishment affidavits.
 O.C.G.A. § 44–7–50(a).

"[A] landlord-tenant relationship exists between a legal title holder and a tenant at sufferance such that the dispossessory procedures set forth in O.C.G.A. § 44–7–50 et seq. are applicable." *Ikomoni*, 309 Ga. App. at 84, 709 S.E.2d at 286 (internal quotation marks, citation, and footnote omitted); *see also Cloud v. Ga. Cent. Credit Union*, 214 Ga.App. 594, 597, 448 S.E.2d 913, 916 (1994) (noting that former owners who remained in possession after foreclosure were tenants at sufferance subject to being dispossessed).

■ The Georgia courts, however, have "held that when a former owner yields possession of the property at some point after the [foreclosure] sale, but then later reenters the property, he is an intruder." *Steed v. Fed. Natl Mortg. Corp.*, 301 Ga. App. 801, 805, 689 S.E.2d 843, 848 (2009) (citing *Durden v. Clack*, 94 Ga. 278, 21 S.E. 521 (1894)). Thus, "if a former owner is not in possession of the property at the time of the foreclosure sale or subsequently goes out of possession, but then later reenters the property aware that a foreclosure sale has already taken place, the former owner is a mere intruder, and the legal title holder is not required to follow the dispossessory procedures set forth in O.C.G.A. § 44–7–50 et seq." *Id.* at 806, 689 S.E.2d at 848; *see also Stevens v. Way*, 167 Ga.App. 688, 689, 307 S.E.2d 507, 509 (1983) ("[T]he relationship of landlord and tenant must exist before a dispossessory hearing can be held under O.C.G.A. § 44–7–50[.]"). Following that authority, Defendant Fannie Mae did not violate O.C.G.A. § 44–7–50 if Plaintiff abandoned the Property. *Vakili*, 2013 WL 3868170, at *4.

■ The evidence, viewed in the light most favorable to Plaintiff as a non-movant, creates a genuine dispute as to whether Plaintiff abandoned the Property or her possessions or whether Plaintiff ceded possession of the Property entirely. Adopting Defendant Fannie Mae's view of the evidence would require the Court to make credibility determinations and weigh evidence, two tasks that the Court cannot undertake at the summary judgment stage. This argument therefore does not entitle Defendant Fannie Mae to summary judgment, nor does Defendant Fannie Mae's contention that Plaintiff's position is based only on Plaintiff's alleged subjective intent, which is purportedly insufficient to allow her claim to survive summary judgment.

## C. Section 9 of the Security Deed

■ Next, Defendant Fannie Mae argues that the Security Deed allowed it to secure the Property and to perform a trash-out. (Def. Fannie Mae's Br. Supp. Mot. Summ. J. at 20–21.) The Security Deed states, in relevant part:

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security In-

strument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

(Security Deed § 9.) Certainly, "Georgia law recognizes that [t]he common law right to the exclusive use and possession of property may be modified by agreement, in which the landowner grants permission to enter his property under certain circumstances." *Bates v. JPMorgan Chase Bank, NA,* 768 F.3d 1126, 1134 (11th Cir. 2014) (alteration in original) (internal quotation marks and citation omitted). As previously noted, however, a genuine dispute remains as to whether Plaintiff abandoned the Property or ceded possession of it. Thus, a genuine dispute would remain as to whether Section 9 of the Security Deed would permit Defendant Fannie Mae to enter the Property and conduct the trash-out. Further, the Court agrees with Plaintiff that it is questionable whether Section 9 of the Security Deed would apply to post-foreclosure proceedings. Instead, it appears that Section 22 of the Security

Deed governs postforeclosure proceedings. (Security Deed § 22.) That section does not specifically grant an immediate right of entry. (*Id.*) Instead, it provides, in relevant part: "If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law." (*Id.*) Thus, Section 22 would seem to require Defendant Fannie Mae to comply with Georgia's statutory dispossessory procedures unless Plaintiff had abandoned the Property. Given the Court's conclusion *supra* Part III.B. that a genuine dispute remains as to abandonment, the Court cannot find as a matter of law that the Security Deed authorized Defendant Fannie Mae to enter the Property and conduct a trash-out.[4] Additionally, Plaintiff correctly points out that Defendant Fannie Mae was not the Lender under the Security Deed, and that it is questionable whether Defendant Fannie Mae would be entitled to enforce any of the Security Deed's provisions. Defendant Fannie Mae thus is not entitled to summary judgment based on this argument.

### D. Independent Contractor

Next, Defendant Fannie Mae argues that it is not responsible for any allegedly wrongful conduct by independent contractors. (Def. Fannie Mae's Br. Supp. Mot. Summ. J. at 13–14.) For the following reasons, the Court rejects that argument.

---

4. In reaching this conclusion, the Court disagrees with the portion of *Carter v. Butts County, Georgia,* 110 F.Supp.3d 1325 (M.D.Ga.2015), finding that paragraph 9 of a security deed modified a borrower's exclusive right to possession of a piece of property and allowed agents of a lender to enter the property and begin cleaning out the property. 110 F.Supp.3d at 1343–44. Importantly, *Carter* made that finding in connection with a summary judgment motion in the context of a § 1983 wrongful arrest claim, ultimately concluding that a genuine dispute remained as to whether probable cause existed to arrest the plaintiffs.

O.C.G.A. § 51–2–4 provides: "An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." O.C.G.A. § 51–2–4. O.C.G.A. § 51–2–5, however, sets forth exceptions to the general rule, and states:

> An employer is liable for the negligence of a contractor:
>
> (1) When the work is wrongful in itself or, if done in the ordinary manner, would result in a nuisance;
>
> (2) If, according to the employer's previous knowledge and experience, the work to be done is in its nature dangerous to others however carefully performed;
>
> (3) If the wrongful act is a violation of a duty imposed by express contract upon the employer;
>
> (4) If the wrongful act is the violation of a duty imposed by statute;
>
> (5) If the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference; or
>
> (6) If the employer ratifies the unauthorized wrong of the independent contractor.

O.C.G.A. § 51–2–5.

 Under Georgia law, although "a landlord may accomplish his statutory duties through his attorney or agent ..., a landlord cannot absolve himself from liability by delegating those duties to an independent contractor." *Ikomoni*, 309 Ga. App. at 84–85, 709 S.E.2d at 286. This is an exception to the general rule that "an employer is not responsible under the theory of respondeat superior for the torts of one employed as an independent contractor." *Owens v. BarclaysAmerican/Mortg.Corp.*, 218 Ga.App. 160, 161, 460 S.E.2d 835, 837 (1995) (internal quotation marks and citation omitted). The exception "provides for liability of the employer if the wrongful act of a contractor is the violation of a duty imposed by statute." *Id.* at 162, 460 S.E.2d at 837. The Georgia Court of Appeals has found that the duties under O.C.G.A. § 44–7–50 are non-delegable, and that an owner therefore may be liable for wrongful eviction in violation of O.C.G.A. § 44–7–50, even where the eviction is performed by an independent contractor. *Id.* at 162, 460 S.E.2d at 838. Thus, if Defendant Fannie Mae had a duty to seek a writ of possession to dispossess Plaintiff, it cannot avoid liability by arguing that independent contractors actually re-keyed the Property or conducted the trash-out. As discussed *supra* Parts III.B. and C., a genuine dispute remains as to whether Defendant Fannie Mae had a duty to seek a writ of possession. Defendant Fannie Mae therefore cannot escape liability based on its independent contractor argument.

 Alternatively, a genuine dispute remains as to whether Defendant Whitman, Mr. Singleton, Defendant AMS, or Mr. Aiola would be considered independent contractors of Defendant Fannie Mae. "The issue in determining whether one was an employee or an independent contractor is whether the employer retained the right to exercise control over the time, place or manner of the work performed." *BellSouth Telecomms., Inc. v. Helton*, 215 Ga.App. 435, 435, 451 S.E.2d 76, 78 (1994) (internal quotation marks and citation omitted). "Where the contract of employment clearly denominates the other party as an independent contractor, that relationship is presumed to be true unless the evidence shows that the employer as-

sumed such control." *Id.* at 435, 451 S.E.2d at 78 (internal quotation marks and citation omitted). Whether an individual or company is an independent contractor generally is a question of fact. *Slater v. Canal Wood Corp. of Augusta*, 178 Ga. App. 877, 878, 345 S.E.2d 71, 72 (1986).

The Georgia courts have recognized that an employer-employee relationship will not arise simply because the employer "has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." *Slater*, 178 Ga.App. at 880, 345 S.E.2d at 74. Instead, for an employer-employee relationship to arise, "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." *Id.* at 880, 345 S.E.2d at 74; *see also Ga. Messenger Serv., Inc. v. Bradley*, 311 Ga.App. 148, 149, 715 S.E.2d 699, 702 (2011) ("The test for determining whether an employer is exercising a degree of control over an independent contractor's work such that the law will deem the independent contractor to be a servant of that employer—thus making the employer vicariously liable for any wrongful acts committed by the contractor—is whether the contract gives, or the employer assumes, the right to control the time, manner, and method of the performance of the work, as distinguished from the right to merely require certain definite results in conformity with the contract." (internal quotation marks, citation, and footnote omitted)).

As Plaintiff correctly points out, Defendant Fannie Mae's Master Listing Agreement with Defendant Whitman, as well as its Sales Guide, which bound Defendant Whitman, Mr. Singleton, and Defendant AMS, imposed many conditions on those companies or individuals and permitted Defendant Fannie Mae to maintain considerable control over their activities and actions. Under those circumstances, the evidence, viewed in the light most favorable to Plaintiff as the non-movant, creates a genuine dispute as to whether those individuals or companies were independent contractors. The Court therefore denies this portion of Defendant Fannie Mae's Motion for Summary Judgment.

### E. Attorney's Fees

Defendant Fannie Mae argues that Plaintiff's claims for attorney's fees necessarily fail because none of Plaintiff's underlying claims can survive summary judgment. (Def. Fannie Mae's Br. Supp. Mot. Summ. J. at 25–26.) As discussed *supra* Parts III.A.-D., a genuine dispute remains as to at least some of Plaintiffs underlying claims. Moreover, for the reasons set forth in the Court's Order addressing Defendant AMS's Motion for Summary Judgment, a genuine dispute remains as to whether Defendants acted in bad faith so as to support an attorney's fees award under O.C.G.A. § 13–6–11. The Court therefore denies this portion of Defendant Fannie Mae's Motion for Summary Judgment.

### F. Punitive Damages

Defendant Fannie Mae argues that the Court previously dismissed Plaintiff's punitive damages claim as it related to Defendant Fannie Mae. (Br. Supp. Def. Fannie Mae's Mot. Summ. J. at 25.) Plaintiff did not respond to this argument, and the Court finds that Plaintiff has abandoned this claim. *See Bute v. Schuller Int'l, Inc.*, 998 F.Supp. 1473, 1477 (N.D.Ga. 1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."); *Welch v. Delta Air Lines. Inc.*,

978 F.Supp. 1133, 1137 (N.D.Ga.1997) ("Plaintiff's failure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims."). Alternatively, the Court's March 9, 2015, Order dismissed Plaintiffs punitive damages claim as to Defendant Fannie Mae. (Order of Mar. 9, 2015 (Docket Entry No. 69).) For the same reasons as set forth in that Order, Plaintiff may not assert a punitive damages claim against Defendant Fannie Mae. The Court therefore grants this portion of Defendant Fannie Mae's Motion for Summary Judgment.

## IV. Conclusion

ACCORDINGLY, the Court **GRANTS IN PART AND DENIES IN PART** Defendant Fannie Mae's Motion for Summary Judgment [119]. The Court **GRANTS** the Motion only as to Plaintiffs claim for punitive damages, but **DENIES** the Motion in all other respects.

The Court **ORDERS** the Parties to file their proposed consolidated pretrial order **WITHIN THIRTY (30) DAYS AFTER THE DATE OF THIS ORDER.** *Unless otherwise ordered by the Court to be filed sooner, all motions in limine are due by no later than fourteen (14) calendar days prior to the date on which the trial of this case is **first** scheduled to begin. Absent a showing of good cause, the Court will not consider untimely-filed motions in limine.*

IT IS SO ORDERED, this the *16th* day of February, 2016.